FILED

2005 Dec-07  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| NIMBUS TECHNOLOGIES, INC., | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| vs. | ] CV-04-CO-00312-W |
| | ] |
| SUNNDATA PRODUCTS, INC., et al., | ] |
| | ] |
| Defendants. | ] |

MEMORANDUM OF OPINION

I.    Introduction.

The Court has for consideration motions for summary judgment filed

by defendant Aaron Geer and defendants David Tarasevich, EZ LED, LLC,

Steven Whelchel, and Ray Whelchel (hereinafter collectively referred to as

"Defendants").   (Docs. 74 & 75.)   Plaintiff Nimbus Technologies, Inc.

("Nimbus") has alleged claims against the defendants for breach of contract;

fraud; violation of the Alabama Fraudulent Transfers Act, Ala. Code §§ 8-9A-

1, et seq. ("Alabama Fraudulent Transfers Act"); violation of the Alabama

Deceptive Trade Practices Act, Ala. Code §§ 8-19-1, et seq. ("Alabama

Deceptive Trade Practices Act"); intentional interference with business

relations; civil conspiracy; violation of the Alabama Trade Secrets Act, Ala. Code §§ 8-27-1, et seq. ("Alabama Trade Secrets Act"); and requests for equitable relief.  (Doc. 55.)  The issues raised in the motions for summary judgment have been briefed by all of the parties and are now ripe for decision.  Upon full consideration of the legal arguments and evidence presented, the defendants' motions for summary judgment are due to be granted in part and denied in part.

II.   Facts.[1]

Plaintiff, Nimbus Technologies, Inc., is a North Carolina corporation owned by John Weir.  (Doc. 74, p. 1.)  Defendant SunnData Products, Inc. ("SunnData") was an Alabama corporation incorporated in Tuscaloosa County, Alabama, in January of 2002, and was owned by defendant Ray Whelchel.  *Id*.  Defendant EZ LED, Inc. is an Alabama corporation incorporated in Tuscaloosa County by defendant Steven Whelchel in June

---

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, the parties' Joint Status Report, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

2003, but it did not appear in this action and default judgments have been entered against it.  *Id.* at 2.  Defendants Ray Whelchel, Steven Whelchel, David Tarasevich, and Aaron Geer are each residents of Tuscaloosa County, and defendant EZ LED, LLC is an Alabama limited liability company, which was organized in Tuscaloosa County and was established in June 2003.  *Id.* The two members of EZ LED, LLC were David Tarasevich and Ray Whelchel. *Id.*

This case arises out of disputes involving a "Tooling Purchase Agreement" (hereinafter referred to as the "TPA") between Nimbus and SunnData, which was executed on May 31, 2002, and revised on August 22, 2002, as well as certain purchase orders related to that agreement.  (Docs. 74, p. 2; 75, p. 8.)  Defendants state that during the years of 2000, 2001, and 2002, SunnData was trying to establish itself in the light emitting diode ("LED") product industry.  (Docs. 74, p. 3; 75, p. 2.)  They also state that it was common knowledge in the LED product industry that a key to success was to develop a high-quality white LED pod product because there were already quality products being produced in other colors (e.g. red, green,

etc.).  (Doc. 74, p. 4.)  Defendants claim that their goal was to develop, produce, and sell a high quality white LED product.  *Id*.

SunnData had limited assets, and according to Defendants it held no other copyrights or trademarks and it had not developed any products that could be patented.  *Id*.  They allege that SunnData had limited sales revenue and that it relied primarily on funds from investors and lenders, principally Charlotte Stanford and Aaron Geer.  *Id*. at 5.  Charlotte Stanford, a retired schoolteacher, invested $100,000 in SunnData, while Aaron Geer provided approximately $117,000 to the company.  *Id*.  In order for SunnData to pursue its goal, it needed to find another source of funding to procure the tooling necessary to produce a high quality white LED product.

Nimbus, owned by John Weir, was in the business of outsourcing for specialized electronics manufacturing, which provides design engineering, manufacturing, testing, and electronic rework and repair services.  (Doc. 77, p. 73.)  In late 2001, Mr. Weir came into contact with defendant Ray Whelchel, and discussions were held regarding the assembly of various colored LED pod products, known as the "E-Z Light", which were already on the market with specifications provided by Mr. Whelchel.  *Id*.  The

companies decided to enter into a "Tooling Purchase Agreement" for the purpose of procuring the tooling necessary to produce white LED products. The partnership with SunnData was Nimbus' first venture into the LED market.  (Doc. 74, p. 5.)  Ray Whelchel was responsible for drafting the TPA with input from both Nimbus and the Robert G. Allen Company, Inc. ("RGA").  (Doc. 77, p. 76.)  According to Defendants, the TPA was premised upon representations and assurances made by RGA, a California-based LED manufacturing company engaged in the business of researching, designing, and developing LED products.  (Docs. 74, p. 6; Doc. 75, p. 2.)  For example, in May of 2002, RGA assured SunnData and Nimbus that it could develop and produce tooling (i.e., hardware and technology) that would be capable of manufacturing a high-quality white LED pod product, and it even displayed sample white LED's that were supposedly manufactured from the "prototype" tooling.  (Doc. 74, p. 6.)  Defendants believe that Nimbus and SunnData entered into the TPA based upon RGA's assurances and representations.  The agreement contained provisions which state that: 1) Nimbus and SunnData entered into a business relationship involving the tooling for a new LED technology which was for the benefit of both

companies; 2) Nimbus was to pay RGA a $50,000 "up front tooling charge";

3) the "tooling" would be the property of Nimbus until Nimbus was

reimbursed $150,000 by SunnData; and 4) once SunnData paid Nimbus

$150,000, the RGA "tooling" would then become the property of SunnData.

(Doc. 75, Exhibit 2.)  Nimbus also agreed to research and file a provisional

patent on behalf of SunnData for the new white LED product once SunnData

reimbursed Nimbus the $150,000; however, the rights to the LED product

would remain with Nimbus until it was reimbursed.  (Doc. 77, p. 77.)  John

Weir signed the TPA on behalf of Nimbus, and defendant Ray Whelchel

signed the agreement as a representative of SunnData.  (Doc. 75, p. 3.)

At the time the parties entered into the TPA, Nimbus was

manufacturing LED pod products for SunnData in colors other than white

under the name "E-Z Light"; however, the TPA itself only mentions the oval

white LED pod product by name.  (Doc. 74, p. 8.)  After the TPA's

execution, Nimbus paid the $50,000 charge to RGA, but RGA neither built

nor acquired the tooling specified under the agreement.  *Id*. at 9.

Therefore, Defendants argue that Nimbus never acquired any tooling or

property rights to any tooling that it could then transfer to SunnData as per

the agreement.  *Id.*  Instead, Defendants state that RGA outsourced the work overseas and had an Asian manufacturer produce the white LED products, which the TPA contemplated would be manufactured by RGA.  *Id.* Defendants complained of problems and defects in the LED products assembled by Nimbus, such as the fact that glue had to be used to fix the plastic housings, Nimbus was unable to procure the white LED's from RGA, and the RGA/Nimbus-generated LED pod products did not receive the approval or certification of the Underwriting Laboratory ("UL"), which Defendants contend was needed to make them marketable.  *Id.* at 10. Defendants also state that Nimbus and SunnData could not reach an agreement regarding the pricing and credit terms for the products Nimbus manufactured pursuant to the TPA, causing production to be halted or delayed.  *Id.* at 10-11.

Plaintiff contends that Ray Whelchel was responsible for designing the LED pod products and that his design did not originally call for UL certification.  (Doc. 77, p. 78.)  LED pod products were capable of being sold without UL certification, and Nimbus claims that such products were sold by SunnData and EZ LED, Inc.  *Id.*

Nimbus was unsuccessful in its attempt to recover the $50,000 that it paid to RGA because RGA had already filed for bankruptcy.  *Id.* at 12. Meanwhile, Defendants contend that SunnData was faced with insolvency and the realization that it was "going nowhere," it had no significant revenue from sales, and without an infusion of capital and the ability to produce a high-quality white LED pod product, Defendants believed that SunnData had no future.  *Id.*  In late 2002 to early 2003, Ray Whelchel and Steven Whelchel presented a business proposal to defendant Aaron Geer involving the EZ LED lighting system.  (Doc. 75, p. 3.)  Mr. Geer was unwilling to lend any additional funds to SunnData unless a business expert was first consulted, and he recommended David Tarasevich because of his experience in manufacturing management.  (Doc. 74, p. 13.)  Mr. Geer realized that if he wanted to receive any kind of return on the $117,000 that he already invested, or loaned to SunnData, Mr. Tarasevich would need to be brought in as an advisor.  *Id.*

Mr. Tarasevich conducted a due diligence inquiry into the LED market at that time by researching potential investors and looking into the operational status of SunnData itself, including its marketing plan, business

prospectus, and current assets and liabilities.  (Doc. 77, p. 85.)  He advised Ray Whelchel and Aaron Geer that they should wind down SunnData and undertake to develop, market, and sell various LED products through the creation of new business entities because of concerns about SunnData's potential liability for the sales of LED products that did not have UL approval, defects in the RGA/Nimbus-generated products, and the fact that a new white LED product would have to be developed using different tooling than the technology that was employed under the TPA between SunnData and Nimbus.  (Doc. 74, p. 14.)

Mr. Tarasevich was responsible for meeting with an attorney to draft the necessary forms for the formation of the new corporation and limited liability company.  (Doc. 77, pp. 91-92.)  Ms. Stanford (a retired schoolteacher who believed that she would receive 8% of the gross profits of SunnData for the rest of her life or a minimum of $200,000 to her estate if she died before receiving $200,000) was approached by Mr. Tarasevich in early 2003 with the new business formation documents and told that she had two choices: receive 4% of the net profits of EZ LED, LLC or receive nothing for her initial $100,000 investment.  *Id*. at 107.  Plaintiffs contend that Mr.

Tarasevich received a 10% ownership interest in EZ LED, LLC, while Ray Whelchel was given a 40% interest for his contributions to SunnData and the original "E-Z Light" product.  *Id.*

In June of 2003, SunnData's assets were sold to EZ LED, LLC, a newly formed Alabama limited liability company.  (Doc. 74, p. 15.)  EZ LED, LLC was created to market LED devices, while EZ LED, Inc. would be responsible for manufacturing the LED products.  (Doc. 75, p. 5.)   The assets included computer and office equipment, a vehicle, the "E-Z Light" copyright, and some inventory.  (Doc. 74, p. 15.)  Defendants assert that the consideration paid for this transfer of assets totaled $477,133.32, including over $100,000 in cash for SunnData to pay its existing creditors.  *Id.* at 16.  Since they view this as an asset purchase only, Defendants argue that EZ LED, LLC did not assume or agree to pay any of SunnData's debts and obligations.   *Id.* Instead, they argue that EZ LED, LLC only agreed to assume the debts owed to Charlotte Stanford and Aaron Geer, in the amounts of $100,000 and $115,000 respectively.  *Id.*  Nimbus was not informed of the sale until it was complete.  *Id.* at 17.

Ray Whelchel leased the same office space to EZ LED, LLC that he previously leased to SunnData.  *Id.*  EZ LED, Inc.'s sign replaced SunnData's sign at the same address, and it sold the same "E-Z Light" product that was created and developed by SunnData.  (Doc. 77, p. 81.)  EZ LED also shared phone and fax numbers with SunnData, and all three companies used the same email address (alsunndata@aol.com).  (Doc. 76, p. 14.)  However, Defendants contend that there were significant differences between EZ LED, LLC and SunnData, including different ownership and management.  *Id.* Defendants also claim that the LED products manufactured through the activities of EZ LED, LLC and EZ LED, Inc. did not involve any of the tooling or technology utilized under the TPA.  *Id.* at 18.  For example, they claim that the white LED product they developed was significantly different than the product produced under the TPA with Nimbus.  *Id.*

Aaron Geer loaned $300,000 to EZ LED, LLC, and Defendants claim that because of his creditor status, he became a co-signor of checks drawn on the LLC's account.  *Id.*  They state that Mr. Geer was a "potential" member/investor, but he never elected to actually become one.  *Id.*  They allege that Mr. Geer was not an organizer, incorporator, member, or

shareholder of EZ LED, LLC or EZ LED, Inc. and that he was not named in the documents which created these entities. *Id*. at 19. However, once EZ LED, LLC became insolvent, Aaron Geer, as the company's largest creditor, foreclosed on and took possession of certain assets of EZ LED, LLC, which were previously purchased from SunnData. (Doc. 74, p. 20.) David Tarasevich served as the member, or contact manager for EZ LED, LLC, and Ray Whelchel's principle involvement with the two companies was as a member of EZ LED, LLC and an employee of EZ LED, Inc. *Id*. Steven Whelchel was an incorporator of EZ LED, Inc. *Id*.

SunnData ordered a number of products from Nimbus with invoices that remain unpaid, and it contracted with Nimbus under Purchase Orders numbered 41602 and 72902 for E-Z Light pod products. (Doc. 77, p. 112.) Nimbus accumulated significant inventory and had internal and external setup and tooling costs to support these purchase orders. *Id*. Under Purchase Order 41602, there is an unpaid invoice in the amount of $19,476.60. *Id*. There are also on-hand inventory costs totaling $31,681.00 and plastic part tooling costs equal to $4,200.00. *Id*. Nimbus also claims that it anticipated building and shipping the remaining backlog on

SunnData's purchase orders for the agreed price of $476,037.00.  *Id*. at 113.

SunnData's failure to authorize Nimbus to build and ship the remaining order

deprived Nimbus of its anticipated profit of $83,301.00.  *Id*.  Nimbus also

claims that SunnData owes it $1,137.00 for defective material paid for but

returned to SunnData.  *Id*. at 114.

III.   Standard.

Summary judgment is proper "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The party moving for summary judgment "always bears the initial

responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the evidence] which it believes demonstrate

the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting

evidence showing that there is no genuine dispute of material fact, or by

showing that the nonmoving party has failed to present evidence in support

of some element of its case on which it bears the ultimate burden of proof.

*Id.* at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party.  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.  Discussion.

A.  Breach of Contract.

Nimbus asserts that the defendants breached various contractual obligations owed by them to Nimbus with respect to the Tooling Purchase Agreement, outstanding purchase orders, and requests for refunds for defective material that had been returned.  The defendants allege that they

are entitled to summary judgment on Nimbus' breach of contract claims based upon the theories that they are not a party to the contracts, the agreement fails for lack of consideration, the purpose of the TPA was frustrated, and the agreement was too vague and indefinite to be upheld. (Docs. 74, 75.)

In order to establish a claim for breach of contract, a plaintiff must show that a valid contract existed between the parties, the plaintiff performed his or her duties under the contract, the defendant breached the contract, and the existence of damages. *Armstrong Bus. Servs., Inc. v. AmSouth Bank,* 817 So. 2d 665, 673 (Ala. 2001). Under Alabama law, the essential elements for the formation of a valid contract are an offer and acceptance, consideration, and mutual assent to the essential terms of the agreement. *Id. See also Baldwin County, Alabama v. Purcell Corp.*, 971 F.2d 1558, 1564 (11th Cir. 1992) (quoting *Shirley v. Lin,* 548 So. 2d 1329, 1332 (Ala. 1989) (recognizing that a contract in Alabama consists of "an agreement, consideration, two or more contracting parties, a legal object, and capacity."))

The defendants in this case attack the very essence of the breach of contract claim by arguing that they were not parties to the agreements between Nimbus and SunnData.  (Docs. 74 & 75.)  Nimbus, a corporation, entered into contracts with SunnData, another corporation, through John Weir and Ray Whelchel in their representative capacities.  Defendants argue that Ray Whelchel did not execute the TPA in an individual capacity, nor did he personally guarantee any of SunnData's obligations under the agreement or purchase orders.  (Doc. 74, p. 3.)  They also assert that Steven Whelchel was simply an employee of SunnData, was never a party to the agreement or purchase orders, and never had any contractual relationship with Nimbus. *Id*.  Finally, Defendants state that David Tarasevich, Aaron Geer, and EZ LED, LLC were never parties to the TPA, the negotiations culminating in the TPA, or the purchase orders issued pursuant to the agreement.  *Id* at 4.

With respect to Aaron Geer, John Weir identified the contracts which Mr. Geer allegedly breached as the TPA, certain purchase orders, and invoices by Nimbus.  (Doc. 75, Exhibit 3, pp. 29-31.)  Mr. Weir testified that Geer's liability on these contracts arises out of his relationship with SunnData and EZ LED, LLC as an investor or "other individual[] who [was]

involved in these transactions . . . . ”  *Id.* at 33.  Each of the contracts that Plaintiff alleges Mr. Geer breached were contracts that were originally entered into by SunnData.  *Id.* at 59.

The contracts that were allegedly breached in this case arose out of dealings between SunnData and Nimbus.  The only signatories to the TPA were John Weir and Ray Whelchel.  The only party, other than Nimbus, that could be liable for breach is SunnData, a corporation organized under the laws of the state of Alabama, and the Court has entered default judgment against SunnData in the amount of $612,333.00 based upon the Complaint. (Doc. 42.)  At the time the contracts were entered into, EZ LED, LLC, was not yet a business entity and there is no evidence that there was a novation or that EZ LED, LLC stepped into the shoes of SunnData for the purposes of assuming liability for SunnData's contracts.  Also, David Tarasevich was not involved with SunnData at the time that it entered into the TPA and purchase orders with Nimbus.  His involvement arose after Aaron Geer and others realized that SunnData was in financial trouble and needed outside assistance to get the company back on the right course.  Aaron Geer and Steven Whelchel were both involved with SunnData, as investor and

employee respectively, but neither of them were involved in the negotiating, drafting, or signing of the TPA. Therefore, the Court finds that not one of the individual defendants was a party to the contracts that existed between Nimbus and SunnData.

B.    Fraud.

Nimbus alleges claims of fraudulent misrepresentation and, alternatively, fraudulent suppression against Defendants. (Doc. 55, p. 11.) It claims that the defendants fraudulently misrepresented to or suppressed various facts or information relating to the TPA, outstanding purchase orders, defective material returned, the closure of SunnData Products, Inc., and the formation of EZ LED, LLC and EZ LED, Inc. (Doc. 76, pp. 9-10.)

1.    Fraudulent Misrepresentation.

A claim of fraud based upon misrepresentation requires: 1) a misrepresentation; 2) of a material existing fact; 3) that was reasonably relied upon by the plaintiff; and 4) damages that were the proximate result of the misrepresentation. *See Sherrin v. Northwestern National Life Insurance Company*, 2 F.3d 373, 378 (11th Cir. 1993) (citing *Eearnest v. Pritchett-Moore*, 401 So. 2d 752, 754 (Ala. 1981); *Waddell & Redd, Inc. v.*

*United Investors Life Insurance Company,* 875 So. 2d 1143, 1160 (Ala. 2003) (quoting *Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988)).  It is not enough for there to be a misrepresentation.  In order to recover on a fraud claim, a plaintiff must prove that he acted on the other party's false representations. *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 5 (Ala. 2004). The test for determining whether a plaintiff has relied is generally whether he would have acted in the same manner in the absence of the representation. *Id.*

Defendants allege in their brief that Nimbus' Complaint and the Statement of Facts in the Joint Status Report do not set forth any specific misrepresentations that the defendants in this action actually committed. (Doc. 74, p. 13.)  This, Defendants claim is because Aaron Geer had no contact with Nimbus, David Tarasevich had only one conversation with John Weir and made no misrepresentations, and Steven Whelchel had limited contact with Nimbus and also made no misrepresentations. (Doc. 74, p. 14.) Ray Whelchel, it is alleged, had the most contact with Nimbus, but they claim that there is no evidence that he made any material misrepresentations of fact relied upon by Nimbus to its detriment. *Id.*

Defendant Aaron Geer contends that he neither misrepresented nor suppressed any material information regarding the TPA or any other contracts because at the time they were entered into Mr. Geer had never spoken to John Weir, Nimbus' president.  (Doc. 75, p. 14.)  Also, he argues that since he was never a party to any of these contracts and agreements, he never had a legal duty to disclose any information or facts relating to them.  *Id*.

Nimbus responds to Defendants and Mr. Geer's arguments by pointing directly to four alleged misrepresentations.   Plaintiff claims that Ray Whelchel represented that he would follow through with his obligations under the TPA if Nimbus provided $50,000 to RGA, as well as representing that there was an investor who would provide $200,000 to SunnData.  (Doc. 76, p. 10.)   Ray Whelchel also allegedly represented that there was a prototype tool that was already developed by RGA for the development of the white LED pod product.   *Id*.   Additionally, Nimbus states that Mr. Whelchel expressed that he would pay for purchase orders for the E-Z Light LED pod product and for defective material returned.  *Id*.  Finally, Nimbus states that both Ray Whelchel and David Tarasevich contacted Nimbus to

inquire into whether they could buy-out the TPA, and when they were told

that it would take $150,000 they sought assurances from Nimbus that it

would continue production on the E-Z Light product so as to enable them

sufficient time to set-up the new business entities while keeping sales,

manufacture, and marketing of the E-Z Light product going in the interim.

*Id.* at 11.

Even if the court looks at the evidence in a light that is most favorable

to Nimbus and treats these four alleged misrepresentations as actually

having occurred, Nimbus has not provided evidence that it relied on these

statements to its detriment.  In fact, Nimbus was obligated under the terms

of the contract to provide $50,000 to RGA.  No evidence has been produced

to show that the misrepresentations alleged had any effect on Nimbus'

conduct.  It has not established the crucial element of reliance, without

which a fraud claim cannot survive.

In his reply brief, Mr. Geer points out that Nimbus only refers to four

misrepresentations by the defendants, none of which were made by Mr.

Geer.  (Doc. 86, p. 7.)   Defendants, in support of Mr. Geer, also state that

Geer had "no contact of any kind with Nimbus."  (Doc. 84, p. 7.) If Mr. Geer

did not make any misrepresentations to Nimbus then Nimbus could not have relied on statements made by Mr. Geer to its detriment.

For the reasons stated above, summary judgment is due to be granted to each of the defendants on Plaintiff's claims of fraudulent misrepresentation.

### 2.    Fraudulent Suppression.

The elements of a claim for fraud based upon the suppression of material facts are: 1) a duty on the part of the defendant to disclose such facts; 2) a concealment or nondisclosure of material facts by the defendant; 3) defendant's knowledge of the facts and their materiality; 4) action by the plaintiff taken in reliance upon the suppression; and 5) damages resulting from the reliance.  *See Sherrin*, 2 F.3d at 378 (citing *Wolff v. Allstate Life Ins. Co.*, 985 F.2d 1524 (11th Cir. 1993) (citing *Hardy v. Blue Cross and Blue Shield of Ala.,* 585 So. 2d 29, 32 (Ala. 1991)).  Silence alone does not constitute fraud unless there exists a duty to communicate that a material fact exists.  *See Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 423 (Ala. 1997).

A duty to disclose material facts arises from either a confidential relationship or the particular circumstances of the case. *Id.  See also* Ala. Code § 6-5-102 (1975); *Trio Broadcasters, Inc. v. Ward*, 495 So. 2d 621 (Ala. 1986).  Whether a duty to disclose exists in a particular case is a question of law to be determined by the trial judge, and such a determination "necessarily requires analyzing the factual background of the case." *State Farm Fire and Cas. Co. v. Owen,* 729 So. 2d 834, 839 (Ala. 1998).  Factors to consider in analyzing whether a duty to disclose exists include the parties' relationship, the value of the particular fact, the relative knowledge of the parties, the practicability of imposing a duty, and the demands of justice. *Id.  See also Hall Motor Co. v. Furman*, 234 So. 2d 37, 41 (Ala. 1970).

Defendants contend that Nimbus fails to allege any specific incidents where they suppressed material facts from Nimbus, with the exception of Nimbus' reference to their failure to initially notify Nimbus of SunnData's going out of business and the selling of its assets to EZ LED, LLC.  (Doc. 74, p. 15.)  Defendants still contend that Nimbus has failed to demonstrate that any of the defendants in this case owed a duty to Nimbus to make these

disclosures or that Nimbus has suffered any damages or injury as a result of the alleged nondisclosures.  *Id*.  Defendants assert that Aaron Geer, David Tarasevich, and EZ LED, LLC had no contractual or other relationship with Nimbus.  *Id*.  They assert that Steven Whelchel had limited dealings with Nimbus and that Ray Whelchel's contacts were limited to his capacity as owner and manager of SunnData.  *Id*.  They further contend that any transactions between SunnData and Nimbus were made at arms length, were commercial in their nature, and did not involve circumstances requiring a duty to disclose.  *Id*.

Defendants also argue that there is no substantial evidence of a confidential or other relationship between Nimbus and any defendant requiring a duty to disclose the transactions in question.  (Doc. 74, pp. 16-17.)  They cite to the case of *Trio Broadcasters, Inc. v. Ward*, 495 So. 2d at 623, for the proposition that "when parties to a transaction deal at arm's length, with no confidential relations, no obligation to disclose arises when . . . information is not requested."  The Alabama Supreme Court went on to state that "our cases recognize that an obligation to disclose does not arise where the parties to a transaction are knowledgeable and capable of

handling their affairs." *Id. See also Shutter Shop, Inc. v. Amersham Corp.,* 114 F. Supp. 2d 1218, 1225 (M.D. Ala. 2000) (noting that under Alabama law "[i]n commercial transactions involving parties to arm's length negotiations . . ., a bright line rule generally applies: The parties have no general obligation to disclose . . ., but each has an affirmative duty to respond 'truthfully and accurately' to direct questions from the other.'"(internal citations omitted)).

Nimbus responds to Defendants and Mr. Geer's arguments by alleging that they conspired with one another to keep their plans to form EZ LED, LLC and EZ LED, Inc. secret from Nimbus until these two new companies were formed and could manufacture the E-Z Light product through another manufacturer, in violation of the TPA.  (Doc. 76, p. 12.)  Nimbus relies on the TPA to establish that Defendants had a duty to act and deal in good faith under Section 1-203 of the Uniform Commercial Code when they formed their plan to shut down SunnData and transfer all of its assets to the two new entities.  *Id*.

In his reply, Mr. Geer argues that Nimbus' brief lists only one material fact that it claims the defendants suppressed: the establishment of EZ LED,

LLC and EZ LED, Inc. (Doc. 86, p. 8.) However, Mr. Geer argues that this claim fails because the defendants owed no duty to Nimbus. *Id.* He also notes that the TPA was between SunnData and Nimbus; therefore, since he was simply a creditor of SunnData, the TPA did not create any affirmative duty in him to inform Nimbus about the formation of the two new business entities. *Id.* Without a confidential or fiduciary relationship between Mr. Geer and Nimbus, Mr. Geer owed no duty to disclose information to Nimbus. *See, e.g., State Farm Fire and Casualty Co. v. Owen,* 729 So. 2d at 837-38.

Whether Defendants had a duty to disclose the sale of SunnData's assets is a question of law to be determined by the trial judge. *See Owen,* 729 So. 2d at 839. The parties to the TPA were two corporations with considerable experience in their respective fields. They dealt with each other at arms-length when negotiating the terms of the TPA, and both SunnData and Nimbus were aware of the risks involved in such a venture. The Court finds it persuasive that other courts have held that no duty to disclose exists between parties to an arms-length transaction when no information is requested. *See, e.g., Trio Broadcasters, Inc. v. Ward*, 495 So. 2d at 623; *Shutter Shop, Inc.*, 114 F. Supp. 2d at 1225. Nimbus had plenty

of opportunities to request information regarding the stability of SunnData in an effort to protect its investment with RGA.  For example, John Weir testified in his deposition that both David Tarasevich and Ray Whelchel contacted Nimbus in, or around, 2002 to inquire into whether they could buy out the TPA.  (Doc. 79, Exhibit 8, pp. 159-62.)  Also, the mere fact that SunnData may have owed a duty to Nimbus does not mean that such a duty is passed on to the other defendants, or that the other defendants had a duty to disclose what they knew.  Therefore, without a duty to disclose, the defendants cannot be held liable for fraudulent suppression.

C.     Intentional Interference with Business Relations.

Nimbus claims that the defendants' conduct amounted to intentional interference with the contractual or business relations between Nimbus and SunnData.  (Doc. 76, p. 22.)  Defendants argue that there were legitimate reasons for their actions, which will provide the justification necessary to prevent a judgment for Plaintiff.  (Doc. 74, pp. 23-24.)  Defendant Aaron Geer asserts that Nimbus has waived this claim by asserting an action for breach of contract against him, and he claims that he did not commit any

affirmative or threatened act of interference with Nimbus' business relations.  (Doc. 75, p. 10.)

The elements of a claim for interference with contractual or business relations are: "1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification for the defendant's interference; and 5) damage to the plaintiff as a result of the interference."  *See Ex parte Awtrey Realty Co., Inc.,* 827 So. 2d 104, 108-09 (Ala. 2001) (quoting *Soap Co. v. Ecolab, Inc.,* 646 So. 2d 1366, 1371 (Ala. 1994)).  Additionally, a plaintiff must produce "some evidence of fraud, force, or coercion [] on the defendant's part."  *Joe Cooper & Assocs., Inc. v. Cent. Life Assurance Co.,* 614 So. 2d 982, 986 (Ala. 1992) (citing *Griese-Traylor Corp. v. First Nat. Bank of Birmingham,* 572 F.2d 1039, 1045 (5th Cir. 1978)).  It is clear that under Alabama law, "an affirmative or threatened act of interference, as distinguished from a refusal or failure to carry out a particular promise, is an essential element of a cause of action for tortious interference with business relations."  *Griese-Traylor Corp.,* 572 F.2d at 1045 (citing *Alabama*

*Power Co. v. Thompson,* 178 So. 2d 525, 528 (Ala. 1965)).  Moreover, the plaintiff must establish that the defendant is a "stranger to the contract with which [he] allegedly interfered."  *Tom's Foods, Inc. v. Carn,* 896 So. 2d 443, 454 (Ala. 2004) (quoting *Atlanta Market Ctr. Management Co. v. McLane,* 503 S.E.2d 278, 282 (Ga. 1998)).  This is the case because a party to a contract cannot be held liable for tortiously interfering with that contract.  *Id.* (quoting *Lolley v. Howell,* 504 So. 2d 253, 255 (Ala. 1987)).  A defendant is considered to be a "party in interest" to a contractual relationship if the defendant may claim "any beneficial or economic interest in, or control over, that relationship."  *Id.* (quoting *McLane,* 503 S.E.2d at 282).

Because Alabama law requires a defendant to be a "stranger" to a contract before he can be held liable for tortiously interfering with it, the Court must first determine whether the defendants in this case are "strangers" to the TPA.  *See Carn,* 896 So. 2d at 454.  Mr. Geer correctly notes that if Plaintiff successfully argues that any of the defendants are parties to the contract (e.g., by arguing that they should be held liable for breach of contract) then such defendants cannot also be "strangers" to that

very same agreement.   In its brief, Plaintiff states that "SunnData was clearly *controlled* by Geer and Tarasevich . . . ."  (Doc. 76, p. 24 (emphasis added).)   Furthermore, as an investor in SunnData, Mr. Geer had a clear economic interest in the decision of whether to follow through with the TPA or to form two new business entities.   Plaintiff is correct in pointing out that neither Tarasevich nor Geer were parties to the contracts, but that is not enough to prove that they are "strangers."   The Alabama Supreme Court has held that control over the business relationship in question is enough to show that a party is not a stranger to the agreement.   *See Carn,* 896 So. 2d at 454.   Therefore, by Plaintiff's own admission, Geer and Tarasevich are not strangers to the contracts and cannot be held liable for intentional interference.

If Nimbus is able to successfully claim that EZ LED, LLC is an alter ego of SunnData, then EZ LED, LLC would be a party to the TPA and could not be a "stranger" to the agreement.   Likewise, if Ray Whelchel and Steven Whelchel are held liable for the actions of SunnData then they cannot be "strangers", and, therefore, they cannot be held liable for interfering with Nimbus' business relations.   If the defendants are found to have exercised

such control over SunnData that they can be held liable by piercing SunnData's corporate veil, or if they stand to receive a substantial economic benefit from SunnData's relationship with Nimbus, then a claim for intentional interference with business relations would be inconsistent.

Even if the TPA is found to be a valid contract and even if the remaining defendants are "strangers" to the TPA, Plaintiff must still show that the defendants interfered with the TPA, but Defendants bear the burden of affirmatively proving that the actions they took with respect to winding down SunnData and selling its assets to EZ LED, LLC were justified under the circumstances. *See Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590, 597, n. 3 (Ala. 1986) (retaining "the principle that justification is an affirmative defense that must be pleaded and proved by the defendant."). Plaintiff argues that the sale of assets between SunnData and the two new EZ LED entities was "nothing short of a bulk transfer, a sham, and a subterfuge" contrived to avoid SunnData's obligations under the TPA. (Doc. 76, p. 24.) According to Defendants, SunnData had the right to sell its assets, and EZ LED, LLC and EZ LED, Inc. had the right to purchase those assets for reasonable consideration. (Doc. 74, p. 25.) They state that

once SunnData's assets were sold to the new entities, EZ LED, LLC and EZ LED, Inc., the new companies had the right to take the business in another direction.  (*Id*. at 24.)  Defendants contend that Nimbus has not offered substantial evidence to dispute the fact that SunnData's assets were sold for "ample consideration and that the new entities . . . [*sic*] had a number of legitimate and justified reasons for going in other directions, including the fact that SunnData had potential liability for sales of LED pod products that did not have adequate UL approval or certification, there were defects and flaws in the RGA/Nimbus generated LED pod product, and a new white LED pod product would have to be developed using different tooling and technology than that used under the tooling purchase agreement."  (Doc. 84, p. 9.)

Plaintiff has identified the alleged interference as the "shutting down" of SunnData and the wholesale transfer of its assets to EZ LED, LLC. Defendants have articulated the reasons that they believe justify their decision to sell SunnData's assets to EZ LED, LLC, but Plaintiff still has not produced evidence of fraud, force, or coercion on the part of the defendants.  *See Joe Cooper & Assocs., Inc.,*  614 So. 2d at 986.  Plaintiff's

claim for intentional interference with business or contractual relations survives only if Nimbus can prove that the defendants acted in a fraudulent or coercive manner or with force when they completed the transfer of SunnData's assets.  They did not.  Therefore, summary judgment is due to be granted on Plaintiff's claim for intentional interference with business relations.

      D.    Alabama Fraudulent Transfer Act.

Nimbus asserts that the defendants' acts relating to the closing of SunnData and the sale of its assets, as well as the creation of EZ LED, LLC and EZ LED, Inc. were "fraudulent, a sham, a subterfuge, a method of circumventing the obligations owed by SunnData to Nimbus and give rise to the defendants' alter ego or successor liability for SunnData's legal obligations."  (Doc. 76, p. 12.)  The Alabama Fraudulent Transfer Act states that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor."  Ala. Code § 8-9A-4(a) (1975).  The purpose of the Act "is to prevent fraudulent transfers of property by a debtor who intends

to defraud creditors by placing assets beyond their reach."  *Thompson Properties v. Birmingham Hide & Tallow Co., Inc.*, 839 So. 2d 629, 632 (Ala. 2002).  The language of the statute states that it is only applicable to transfers "made by a debtor," and debtor is defined as "[a] person who is liable on a claim."  *Id.* (quoting Ala. Code § 8-9A-1(6)).  "Creditor" is defined by the statute as "[a] person who has a claim," and a "claim" is "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...."  *Id.* (quoting Ala. Code §§ 8-9A-1(3-4)).  The Alabama Supreme Court has refused to extend the application of the Act to transferors other than the debtor.  *See, e.g., Hart v. Pugh*, 878 So. 2d 1150, 1155 (Ala. 2003).  Because "it is not for the judiciary to impose its view on the Legislature," the Court would not extend the Act to apply to transferors who are in control of the debtor's assets.  *Id.* (quoting *Ex parte T.B.*, 698 So. 2d 127, 130 (Ala. 1997)).

A fraudulent transfer may be either actual or constructive.  Actual fraudulent transfers require an intent to hinder, delay, or defraud any creditor of the debtor.  *See, e.g., Gordon v. Gorman*, 436 So. 2d 851,  854

(Ala. 1983).  In determining whether the debtor possessed the requisite intent, the trial court is to consider several factors, including "to whom the transfer was made, the amount of assets transferred, and the financial condition of the debtor before and after the transfer." *Varner v. Varner*, 662 So. 2d 273, 276 (Ala. Civ. App. 1994), *rehearing denied* (1995), *cert. denied* (Ala. 1995).  A "constructive fraud" occurs "when a grantor, indebted at the time, conveys property without receiving valuable consideration." *Champion v. Locklear*, 523 So. 2d 336, 338 (Ala. 1988).

Defendants contend that "it is undisputed there was no violation of this Act." (Doc. 74, p. 18.)  As support for this proposition, they state that SunnData was "insolvent and floundering" and that it would "not survive without operating capital."  *Id*.  Aaron Geer was not willing to lend additional funds to SunnData, which Defendants claim left the company with two choices: file for bankruptcy or sell its assets. *Id*.  Defendants state that SunnData's assets were sold to EZ LED, LLC for "ample consideration" of over $100,000 in cash.  *Id*.  They assert that the ownership and management of each company was different, and having purchased the assets of SunnData, EZ LED, LLC was free to use them in the manner in which they

were used by SunnData.  *Id*.  Defendants argue that EZ LED, LLC developed and marketed a white LED pod product that was different than the product developed by SunnData, and it did not use any of the tooling or technology described in the TPA.  *Id*. at 18-19.

Defendants contend that there was no intent to hinder, delay, or defraud Nimbus, and they correctly point out that  "every conveyance that frustrates a creditor is not a fraudulent conveyance under the statute." *Aucoin v. Aucoin,* 727 So. 2d 824, 827 (Ala. Civ. App. 1998).  (Doc. 74, p. 19.)  They allege that David Tarasevich advised Ray Whelchel and Aaron Geer that SunnData should be wound down and that the two new entities were created not to avoid the TPA, but because SunnData had potential liability for sales of LED pod products that did not have adequate UL approval or certification, there were defects and flaws in the RGA/Nimbus LED pod product, and a new white LED pod product would have to be developed using different tooling and technology than that used under the TPA.  *Id*.

Defendants also argue that Nimbus has misinterpreted the remedial provisions of the statute.  They assert that Nimbus is not seeking the assets

that SunnData sold to EZ LED, LLC.  Instead, according to Defendants, Nimbus is attempting to use the Alabama Fraudulent Transfers Act to make the other defendants parties to the TPA, which is not an available remedy under the Act.  (Doc. 74, p. 20.)

Plaintiff argues that the acts and circumstances coupled with the declarations of the parties established that Defendants conspired to "gut" SunnData and literally transfer all of its assets to EZ LED, LLC and EZ LED, Inc. so as to enable SunnData to avoid the legal rights of its creditors.  (Doc. 76, p. 14.)  As circumstantial evidence in support of this allegation, Nimbus says that "the documents, testimony and timeline of events is extremely telling in light of the same individuals being involved with the same building, phone number, fax number, and use of the same email (alsunndata@aol.com) for all three business entities."  *Id.*

Plaintiff also argues that Defendants have not affirmatively pled valuable consideration for the transfer of assets from SunnData to the new entities.  (Doc. 76, p. 16.)  Nimbus asserts that Messrs. Geer and Tarasevich forced SunnData into a "bulk transfer" sale to EZ LED, LLC to gain a majority controlling ownership, enabling Mr. Geer to control the company to which

he loaned money.  *Id.* at 17.  Nimbus claims that the "bulk transfer" of SunnData's assets "was made to insiders while SunnData still owed a lot of money to its creditors."  *Id.* at 18.  By transferring the assets, it is alleged that SunnData's ability to carry on its business was effectively destroyed, rendering it incapable of paying back its creditors.  *Id.*

Mr. Geer asserts that he is not a debtor of Nimbus; rather, he is a creditor of SunnData.  (Doc. 75, p. 17.)  He testified at his deposition that rather than an investment into EZ LED, LLC, he made a loan to the entity that was evidenced by a loan agreement and secured by the assets of the new company.  (Doc. 74, Exhibit 5, pp. 78-79.)  As a creditor, he cannot be liable for any sale, transfer, or conveyance of SunnData's assets.  Therefore, he argues that Nimbus' claim against him based upon a violation of the Alabama Fraudulent Transfer Act is due to be dismissed.  *Id.*

Like the claim for breach of contract, the Court must point out that only SunnData was indebted to Nimbus.  The Alabama Supreme Court has refused to extend the Act to apply to transferors other than the debtor, and, therefore, only SunnData may be held liable under the Alabama Fraudulent Transfer Act.  Even if the defendants were in control of SunnData's assets,

Alabama's Supreme Court has expressly refused to apply the Act to third-partyies who exerted control over the debtor's assets, but if successful Nimbus could set aside the transfer.  Plaintiff is limited to the remedies outlined in section 8-9A-7 of the Alabama Code: 1) avoidance of the transfer to the extent necessary to satisfy Plaintiff's claim; 2) attachment or other remedy against the assets transferred or other property of the transferee in accordance with any other statute or rule of Alabama Civil Procedure; or 3) either an injunction against further disposition of the property, appointment of a receiver to take charge of the assets, or any other relief as the circumstances may require.  Ala. Code § 8-9A-7 (2002).  If the transfer of assets from SunnData to EZ LED, LLC is found to be fraudulent, Nimbus may seek to avoid the transfer.

Mr. Geer testified at his deposition that he foreclosed on the loan and took possession of computers, existing inventory, some office equipment, and a vehicle.  *Id*. at 109-10.  The inventory is still at Mr. Geer's place of business in Cottondale, Alabama, and the vehicle was sold for $4,000.  *Id*. There is some disagreement over who owns the rights to the "E-Z Light"

product, but Ray Whelchel has stated on the record that Mr. Geer "owns that concept now since 7/24/03."  *Id*. at 303.

Based upon the evidence before the Court, Nimbus cannot recover from Steven Whelchel or David Tarasevich under the Act because they were neither debtors nor recipients of the assets that were transferred, and they were not owners or shareholders of SunnData.   Therefore, summary judgment is due to be granted on Plaintiff's claims against them under the Fraudulent Transfers Act, except that to the extent the defendant has possession of, or any interest in any asset transferred from SunnData, the defendant remains a defendant.

E.    Piercing the Corporate Veil and Alter Ego.

Plaintiff argues that there is sufficient evidence that the corporate forms were completely disregarded by all of the defendants to such a degree that the three business entities became the alter egos of the individual defendants, who should all, therefore, be held individually liable for SunnData's legal obligations.  (Doc. 76, pp. 20-21.)  In Alabama, "[t]he concept that a corporation is a legal entity existing separate and apart from those who compose it is a well-suited rule," but it is also true "that the

corporate form can be set aside, and the individual or individuals owning all of its stock and assets can be treated as the business entity, even in the absence of fraud, as a means of preventing injustice or inequitable consequences." *Co-Ex Plastics, Inc. v. AlaPak, Inc.*, 536 So. 2d 37, 38 (Ala. 1988) (citing *Cohen v. Williams*, 318 So. 2d 279, 280 (Ala. 1975)).  Alabama courts have held that the corporate form may be set aside "as a means of preventing injustice or inequitable consequences." *Southern Sash Sales and Supply Co., Inc. v. Wiley*, 631 So. 2d 968, 970 (Ala. 1994) (citing *Cohen*, 318 So. 2d at 281).  However, "[p]iercing the corporate veil is not a power that is lightly exercised." *Galactic Employer Services, Inc. v. McDorman*, 880 So. 2d 434, 441 (Ala. Civ. App. 2003) (citing *Co-Ex Plastics,* 536 So. 2d 37; *Alorna Coat Corp. v. Behr*, 408 So. 2d 496 (Ala. 1981)).  "The fact that a party owns all or a majority of the stock of a corporation does not, of itself, destroy the separate corporate identity." *Id.* (citing *Messick v. Moring*, 514 So. 2d 892 (Ala. 1987); *Forester & Herue, Inc. v. Daniels*, 409 So. 2d 830 (Ala. 1982)).  To pierce the veil, a plaintiff must prove the existence of fraud in the assertion of the corporate form or that the recognition of the entity as a corporation will result in injustice or inequitable consequences.

*See Washburn v. Rabun*, 487 So. 2d 1361, 1366 (Ala. 1986); *Cohen v. Williams*, 318 So. 2d 279, 281 (Ala. 1975).  In *Southern Sash*, the Court held that the jury could pierce the corporate veil based upon evidence that the old and new companies shared the same CEO, the new company purchased the assets of the old company, both entities had the same bank account number, both entities had the same address, they conducted the same line of business with the same employees, and they had the same telephone number.  631 So. 2d at 970.

Defendants assert that EZ LED, LLC was not simply an alter ego of SunnData.  (Doc. 74, p. 22.)  They claim that the two new entities were organized for legitimate business purposes, created with sufficient capital, conducted business meetings, issued financial statements, and otherwise operated as legitimate business entities.  *Id*.  Therefore, Defendants argue that the Alabama Fraudulent Transfer Act was not violated and Nimbus should not be allowed to recover on theories of alter ego or successor liability.  *Id*.  Defendants cite to the case of *Gallenburg Equipment, Inc. v. Agromac International, Inc.*, 10 F. Supp. 2d 1050 (E. D. Wis. 1998), as persuasive authority on this point because the court found no successor

liability even though ownership of the new corporation was comprised of management of the old entity, the new corporation acquired the assets of the old company through an auction, and after the asset purchase, the new corporation refused to honor agreements entered into by the old corporation.

Nimbus argues that the defendants in this case disregarded the corporate form, and, therefore, should be held liable for the debts of SunnData. (Doc. 76, p. 21.)  In support of its argument, Plaintiff cites to the Alabama Bulk Transfer laws, Ala. Code § 7-6-101-111 (1975), which were repealed in 1996.  Plaintiff points the Court to the official comments to § 7-6-101 as persuasive evidence of the kinds of activities that the Alabama legislature was trying to curtail.   The comments state that the Bulk Transfers Article "was enacted by the legislature in response to the problem of merchants selling their inventory, pocketing proceeds, and leaving their creditors unpaid."  Official Comments to Ala. Code § 7-6-101 (1975).  Under the Bulk Transfer laws, a transfer of the transferor's assets not in the ordinary course of business was generally held to be ineffective against a creditor of the transferor.  Ala. Code § 7-6-102 (1975).  Plaintiff contends

that a bulk transfer occurred when SunnData sold its assets to EZ LED, LLC, since the sale left SunnData without any inventory, equipment, or proprietary rights. (Doc. 76, p. 22.)  However, the Bulk Transfer Laws also focused on the transferor and not third-party actors.

Piercing the corporate veil and disregarding an entity's corporate identity to hold its principals liable for the actions of the corporation is not an action that is to be taken lightly.  Following the *Southern Sash* line of considerations, the Court finds it extremely telling that: 1) the employees and managers of SunnData and the new companies were largely identical; 2) EZ LED, LLC purchased all of the assets of SunnData; 3) EZ LED, LLC leased the same office space from Ray Whelchel that was previously leased to SunnData; 4) EZ LED, LLC and SunnData used the same phone and fax numbers; and 5) the email address "alsunndata@aol.com" was used for all three companies.  631 So. 2d 968.  Because of these factors, and perhaps others that have not revealed themselves at this stage in the case, the Court is of the opinion that a jury may find that the corporate veil of SunnData may be pierced or that EZ LED, LLC was an alter ego of SunnData; however,

the decision is for the jury and not for the Court on motion for summary judgment.

Since the Court has already entered judgment against SunnData in the amount of $612,333.00 on October 26, 2004, any defendant held liable under the theory of piercing the veil will be held liable for SunnData's breach of contract and violation of the Alabama Fraudulent Transfers Act. (Doc. 42.)  The Court's entry of a default judgment conclusively establishes liability against SunnData, and any defendant held liable for SunnData's actions under piercing the corporate veil is liable for satisfying the judgment entered against SunnData.  *See, e.g., Oliver v. Towns*, 738 So. 2d 798, 803 (Ala. 1999); *Isbell v. Elsberry*, 793 So. 2d 803, 804 (Ala. Civ. App. 2001).

Not all of the defendants in this action can be held liable for SunnData's obligations.  Only those individuals who owned stock in SunnData, or shared in the ownership of SunnData's assets, can be held liable for its obligations.  *See, e.g., Co-Ex Plastics,* 536 So. 2d at 38. SunnData is an Alabama corporation owned by defendant Ray Whelchel. (Doc. 74, p. 1.)  Therefore, if the jury finds that the corporate veil should

be pierced only Mr. Whelchel can be held liable for the debt owed to Nimbus by SunnData.

F.    Alabama Trade Secrets Act.

Nimbus asserts that the defendants have violated the Alabama Trade Secrets Act, Ala. Code §§ 8-27-1, et. seq. (1975).   (Doc. 76, p. 27.) Defendants claim that there is no evidentiary support for such a claim because Nimbus never acquired any "trade secret."   (Docs. 74, p. 25; Doc. 75, p. 18.)

To receive the protection of the Alabama Trade Secrets Act, a plaintiff must show that the information sought to be protected meets the definition of a trade secret.   *See Ex parte Ocwen Federal Bank, FSB*, 872 So. 2d 810, 816 (Ala. 2003).   A "trade secret" is defined as information that:

> a. Is used or intended for use in a trade or business;
> b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
> c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
> d. Cannot be readily ascertained or derived from publicly available information;
> e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

f. Has significant economic value.

Ala. Code § 8-27-2(1) (2002).  The question of whether information constitutes a trade secret under Alabama law is one of fact.  *See, e.g., Soap Co. v. Ecolab,* 646 So. 2d 1366, 1372 (Ala. 1994).  As the plaintiff, Nimbus has the burden of establishing each of the statutory elements set forth in § 8-27-2(1) in order for the information in question to be considered a trade secret.  *See Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1158 (11th Cir. 2004) (citing *Public Systems, Inc. v. Towry,* 587 So. 2d 969, 971 (Ala. 1991)).  Once it is established that a trade secret exists, someone who discloses or uses the trade secret without a privilege to do so is liable to the holder of the secret for misappropriation if: 1) the person discovered the trade secret by improper means; 2) the disclosure or use constitutes a breach of confidence reposed in that person by the other; 3) the person learned of the trade secret from a third person, and either knew or should have known that the information was a trade secret and that it had been appropriated under circumstances which violate the first two provisions of this statute; or 4) the person learned information and either knew or should

have known that it was a trade secret and that its disclosure was made to that person by mistake.  Ala. Code § 8-27-3 (2002).

Defendants and Mr. Geer assert that there is no evidence that Nimbus ever owned or acquired any trade secret under the TPA.  (Docs. 74, p. 25; 75, p. 18.)  According to Defendants, the only possible trade secret would have been the tool/tooling that Nimbus never acquired from RGA.  (Doc. 74, p. 25.)  Defendants argue that Nimbus cannot recover under the Alabama Trade Secrets Act absent evidence that the Defendants improperly used a trade secret belonging to Nimbus.  *Id*. at 26.  They assert that Nimbus has not met its burden by showing that it owned a trade secret that could not be readily ascertained or derived from information available to the public and that Defendants improperly used any trade secret that Nimbus contends that it owns.  *Id*.

Mr. Geer argues that Nimbus has failed to specify what "trade secret" the defendants have misappropriated.  (Doc. 75, p. 18.)  He asserts that the TPA required RGA, and not Nimbus, to develop a special "tool" to produce white LED pod devices.  *Id*.  To his knowledge, no such "tool" has ever been developed, and in his deposition, John Weir testified that he learned that

RGA did not produce an acceptable tool for SunnData to produce white LED pod products.  *Id.*  Geer argues that since no "trade secret" was ever developed, he could not be held liable for misappropriating one.  *Id.*

However, according to Nimbus, it bases its claim on the fact that the defendants started selling the same E-Z Light product that was sold by SunnData.  (Doc. 76, p. 28.)  It contends that the trade secret was the E-Z Light pod product that was manufactured by Keenan & Associates, LLC for EZ LED, LLC and EZ LED, Inc. by using the E-Z Light drawings, schematics, devices, and compilations of information used by SunnData to give it an advantage over competitors who did not know how to use the product.  *Id.*

The burden is on Nimbus to prove that it held a trade secret under the Act.  *See, e.g., Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d at 1158. Nimbus asserts that the trade secret is the E-Z Light product that was sold by SunnData and later sold by EZ LED, LLC and EZ LED, Inc., but Nimbus fails to provide any evidence as to why the information is not generally known in the trade or business, why it cannot be readily ascertained or derived from publicly available information, or how it is the subject of efforts to maintain its secrecy.  Additionally, Plaintiff never explains why it is the holder of the

trade secret.  In fact, it states in its brief that the information was used by "SunnData and gave it an advantage over competitors."  (Doc. 76, p. 28.) The fact that the information, schematics, and drawings may have been a trade secret to SunnData does not mean that Nimbus can claim rights to the very same information as a trade secret of its own.  The bare assertion that the "E-Z light LED pod product" or some other asset acquired from SunnData is a trade secret is insufficient to meet Plaintiff's burden of proving that the information sought to be protected meets the definition of a trade secret under the Act.  Therefore, the defendants are entitled to summary judgment on Plaintiff's claim for violation of the Alabama Trade Secrets Act because no genuine issue of fact exists.

G.    Civil Conspiracy.

Plaintiff asserts that the defendants in this action conspired to do the things alleged in Nimbus' Complaint and Amended Complaints, including breach of contract, fraudulent misrepresentation, and fraudulent suppression.  (Doc. 76, p. 25.)  In its response to the defendants' motions for summary judgment, Nimbus claims that Geer and Tarasevich: 1) intentionally interfered with the contracts between Nimbus and SunnData;

2) secretly shutdown SunnData; 3) established two new business entities; 4) fraudulently transferred the assets of SunnData so as to circumvent or avoid SunnData's obligations to Nimbus under the TPA, outstanding purchase orders, and claims for reimbursement for defective material returned; 5) improperly utilized, used, and sold both the E-Z Light colored and the white LED pod products developed through the TPA; and 6) manufactured all colored LED pod products from other manufacturers other than Nimbus while keeping Nimbus in the dark as to the true nature of these events. *Id*. Defendants argue that Nimbus' conspiracy claim must fail because such a claim must be based upon a valid underlying cause of action, and Defendants do not believe that Nimbus' underlying claims can succeed. (Doc. 74, p. 26.) Mr. Geer argues that he was neither a party to SunnData's contracts, nor a member, owner or organizer of SunnData, and the sale of SunnData's assets and the formation of the two new business entities was not fraudulent. Therefore, he alleges that since Plaintiff has failed to prove that Geer committed an actionable wrong against Nimbus, its civil conspiracy claim against him is due to be dismissed. (Doc. 75, pp. 23-24.)

A civil conspiracy claim requires the plaintiff to establish that two or more individuals combined "'to accomplish a lawful end by unlawful means.'" *Drill Parts & Serv. Co. v. Joy Mfg. Co.,* 619 So. 2d 1280, 1290 (Ala. 1993) (quoting *Nelson v. University of Alabama System*, 594 So. 2d 632, 634 (Ala. 1992)).   Also, a defendant will not be held liable for civil conspiracy without establishing the commission of some other "'independently recognized tort.'" *Funliner of Alabama, L.L.C. v. Pickard*, 873 So. 2d 198, 211 (Ala. 2003) (quoting *Millett v. Atlantic Richfield Co.,* 760 A.2d 250 (Me. 2000)).   *See also Drill Parts & Serv. Co.*, 619 So. 2d at 1280 (holding that a plaintiff must have a valid underlying cause of action in order to bring a claim for civil conspiracy); *Griese-Traylor Corp.,* 572 F.2d at 1045 (holding that "[i]n order for there to be liability for conspiracy, there must be an 'actionable wrong.'").   If there is no liability for the independent underlying tort, then there cannot be liability for civil conspiracy.  *See, e.g., Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 280 (Ala. 2000) (quoting *Triple J Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993)) (stating that "[a] conspiracy claim must fail if the underlying act itself would not support an action.").

Defendants correctly state that there can be no actionable claim for conspiracy for simply engaging in business operations, such as purchasing the assets of an insolvent corporation, creating new business entities, lending money to the new business entities, and undertaking to operate the new businesses for legitimate business purposes.  (Doc. 74, p. 27.)  This is what they claim Ray Whelchel, Steven Whelchel, David Tarasevich, EZ LED, LLC, and Aaron Geer did collectively.  *Id*.  Defendants contend that none of them had an obligation to continue to operate SunnData as a going concern when it was "going nowhere without Aaron Geer lending it more money."  *Id*. Even though Nimbus would no longer receive the benefit of entering into the TPA with SunnData, Defendants argue that it would not receive the benefit of the agreement even if SunnData was not shut down and its assets sold to EZ LED, LLC.  *Id*. at 28.  By the time the assets were sold, Defendants contend that SunnData was already effectively out of business, and they allege that Nimbus was at least partly responsible for its failure.  *Id*.

In order for Plaintiff to prevail against Mr. Geer on a claim for civil conspiracy, Mr. Geer correctly points out that he, or someone else in the conspiracy, must have committed an actionable wrong against Nimbus.

(Doc. 75, p. 23.)  He argues that since he was not a party to SunnData's contracts and was not a member, organizer, or owner of SunnData, Nimbus' underlying actions against him cannot succeed.  Mr. Geer also argues in his reply brief that the only evidence supplied by Plaintiff in support of its conspiracy claim is a general reference to it's own Additional Statement of Facts.  (Doc. 86, p. 10.)  Mr. Geer submits that Nimbus cannot point specifically to which of its ninety additional facts support its conspiracy claim because there was no conspiracy, and for that reason its claim is due to be dismissed.  *Id.*

Nimbus responds to the defendants arguments by stating that "it is clear that they did act in concert to do [the things alleged in the Complaint and Amended Complaints] and avoid the legal obligations of SunnData by setting up these two new business entities."  (Doc. 76, p. 26.)

Plaintiff's only remaining claims are for violation of the Alabama Fraudulent Transfers Act and holding Ray Whelchel liable under the theory of piercing the corporate veil.  A claim for civil conspiracy requires an "'independently recognized tort,'" and there are no remaining torts to support such a claim.  *Pickard*, 873 So. 2d at 211.  Therefore, the

defendants' motions for summary judgment are due to be granted with respect to Plaintiff's claim based upon civil conspiracy.

H.     Equitable Relief.

Nimbus asserts that, as a matter of equity, good faith, and fairness, it is entitled to certain equitable relief, including an accounting from the defendants as to the sale of products in violation of the TPA, restitution, and  other available equitable remedies.  (Doc. 76, p. 29.)  Defendants argue that since they believe that they are entitled to summary judgment on each of Nimbus' underlying claims, its claim for equitable relief must also fail as a matter of law.  (Doc. 74, p. 28.)  Aaron Geer contends that Plaintiff's claim for equitable relief is due to be dismissed because he has in no way been unjustly enriched as a result of the matters that are now the subject of this litigation.  (Doc.  75, p. 24.)

Under  Alabama  law,  "[t]he  essence  of  the  theories  of  unjust enrichment or money had and received is that a plaintiff can prove facts showing that defendant holds money which, in equity and good conscience, belongs to plaintiff or holds money which was improperly paid to defendant because of mistake or fraud."  *Hancock-Hazlett Gen. Constr. Co. v. Trane*

*Co.*, 499 So. 2d 1385, 1387 (Ala. 1986) (emphasis omitted).  The legal doctrine of unjust enrichment "is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Battles v. Atchison*, 545 So. 2d 814, 815 (Ala. 1989).  One mechanism through which courts attempt to prevent unjust enrichment is the constructive trust.  *See, e.g., Brothers v. Fuller*, 607 So. 2d 135, 137 (Ala. 1992); *Brothers v. Moore*, 349 So. 2d 1107, 1108 (Ala. 1977).  Courts will impose a constructive trust on money or property that has been acquired either by fraud or, in the absence of fraud when it would be inequitable to allow it to be retained by the holder.  *Id*.  Alternatively, a court may order restitution as a remedy for the "detrimental effects caused by unjust enrichment." *Utah Foam Products, Inc. v. Polytec, Inc*., 584 So. 2d 1345, 1351 (Ala. 1991).  In order to recover restitution, a plaintiff must not only establish the existence of unjust enrichment, but he or she must also establish the reasonable value of the services rendered.  *Id*. Whether the claim is for restitution, a constructive trust, or some other equitable remedy, the success or failure of an action based upon unjust enrichment depends upon the facts and circumstances of the individual

case.  *See, e.g., Avis Rent A Car Systems, Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2003).

Aaron Geer characterizes Plaintiff's claim for equitable relief as a "'catch-all' provision" to its Second Amended Complaint.  (Doc. 75, p. 24.) He argues that he has not been enriched in any way as a result of his involvement with SunnData, EZ LED, LLC, or EZ LED, Inc.  *Id*. at 25.  In fact, Mr. Geer testified that he has yet to see full repayment of the loans that he made to SunnData and EZ LED, LLC.  (Geer Depo. pp. 109-10.)  Therefore, he argues that it would be inequitable for Nimbus to obtain any relief from him when he has neither committed any wrongful acts against Nimbus nor received any benefit, just or unjust, from any of the matters that are the subject of this litigation.  *Id*.

Plaintiff contends that it "performed under this contract 100%."  (Doc. 76, p. 30.)  It alleges that it paid Ray Whelchel the $50,000 that he requested and that SunnData had colored LED pod products that worked satisfactorily, with the exception of some minor problems with the plastic housing.  *Id*.  Nimbus asserts that EZ LED, LLC sold virtually the same product as SunnData and that SunnData could have waited until the white

LED design could have been perfected to the satisfaction of the defendants. *Id.* Therefore, Plaintiff argues that defendants would be unjustly enriched if they are allowed to retain the revenues received from the sale of E-Z Light products sold by EZ LED, LLC and EZ LED, Inc.

Because the Court holds that the defendants are entitled to summary judgment on Plaintiff's fraud claims, any theory of unjust enrichment by Nimbus must be premised on the claim that revenue from sales of the E-Z Light product were the result of mistake. *See, e.g., Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So. 2d at 1387. Because SunnData has already been adjudicated liable for breach of contract, Nimbus may be entitled to the equitable remedies of an accounting for the revenues from the E-Z Light product and restitution in the amount the defendants were unjustly enriched. The question that remains at this point is whether Ray Whelchel or Aaron Geer holds the rights to the E-Z Light product and whether either or both of them have profited from its use. For these reasons, the Court finds that the defendants are not entitled to summary judgment on Plaintiff's claim for equitable relief.

I.      Alabama Deceptive Trade Practices Act.

Defendants argued that, prior to filing suit, Nimbus failed to send the written demand, or notice, to the defendants under Alabama Code § 8-19-10(e), which is a condition precedent to filing suit under the Alabama Deceptive Trade Practice Act. (Doc. 74, pp. 22-23).  Nimbus has conceded that it procedurally waived its right to pursue a claim under the Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1, et seq., by pursuing its common law causes of action and remedies in this case.  (Doc. 76, p. 22.) Therefore, Plaintiff's claim for relief under the Alabama Deceptive Trade Practices Act is dismissed.

V.      Conclusion.

For the reasons stated above, the defendants' motions for summary judgment are due to be granted in part and denied in part.  A separate order in conformity with this opinion will be entered.

Done this 7th day of December 2005.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153